All persons having business with the Honorable United States Court of Appeals for the 3rd Circuit are admonished to draw near and give their attention. This court is now in session. God save the United States and its Honorable Court. Please be seated. Thank you, everyone, for getting here. This has been the case from hell. Trying to schedule it and then we finally get a schedule, not just this case, but particularly the next one, the next two, and then the weather that greeted us this morning amazed everybody out here in town. So thank you for being with us. Ms. Brunson? Before you begin, Ms. Brunson, I want to, I privately acknowledge, but I want to publicly acknowledge and thank Judge Cheryl Dackerman, a very, very distinguished and very experienced jurist from the District Court of New Jersey who has kindly consented to sitting with us on this part of our sitting and I want to speak for Judge Ambrose when I publicly acknowledge him. Thank you very much for his intellect and the opportunity to give us a try and wade through some of these cases. Thank you, Judge McKee. Thank you, Judge Ambrose. Thank you, Your Honors. May it please the Court. My name is Kimberly Brunson. Keep your voice up, would you please? Certainly, Your Honor. My name is Kimberly Brunson and I represent the appellant, Robert Valdes-Leal, in this case. With the Court's permission, I'd like to reserve three minutes for rebuttal. That's fine. Let me ask this. What if there had been no request for consent here and the facts were still as they were except for the fact that the officer asked for consent and your client denied consent, all the other facts, and the officer said to himself, you know, I, um, this case just cries out for there being drugs concealed in the driver's side door. He's telling me the window hasn't rolled down. There's air freshener. He's lying about private contacts with the police. He's heading the wrong way. He's heading the wrong way. He's going to Philadelphia. He's trying to get to Columbus from Texas. He doesn't know his uncle from his cousin. The car was in Mexico not long ago and he's got a park eviction for drugs. In fact, in Mexico 21 times. And so the officer said, you know, I better get a dog out here. And he goes back and he tells your client, have a seat, Mr. Leal. Make yourself comfortable. We're going to get you out of here as soon as we possibly can, but I need to have a dog come out and sniffer in your car and see what he can find, if anything. Would that have been a problem? Had he told him he was free to leave, Your Honor? I'm not saying he was free to leave. He just told him, have a seat. I'm going to bring a dog out here. I believe in this case it would, simply because of the length of the detention. To begin with, he had a right to stop the car in light of the window tint violation. Did he not? Yes. Yes. It seems like what you're saying is, OK, he has a right to stop the car. There are things that jump out at him, including the fact that the person claims he doesn't have a criminal record. And it shows that under the El Paso information that he got, that he did. What it seems as if you're saying is that when he told him you are free to leave, that wipes the slate clean and everything starts new. Not necessarily, Your Honor. I'm not arguing that it nullifies his... The trooper's actions in telling Mr. Leal you are free to go represents that he has ended that seizure for forthment of purposes. And he felt there were no reasonable suspicion to detain him for he should have not told him he was free to go. As I argued in my brief, free to go must mean you're free to go. It can't mean... But that's why I asked my question, what if he hadn't said that? What if he had just said, have a seat? Then I still think we have a problem with the length of the detention. In that scenario, he was pulled over at 1.30 p.m. The drug dog did not arrive until 3.05 and did not alert until 3.10. Those are facts that are set forth in the trooper Leal's affidavit. There are extenuating circumstances that the government would argue exist, but maybe it's a two-part question. Did Trooper Volk have the requisite reasonable suspicion to warrant a further detention of Leal after the initial purpose of the traffic stop had ended? Under these circumstances, I believe he did not. Not because he told him he was free to leave. We don't have a scenario. Part two is then, if he says you are free to leave, that that, in my words, does that in effect wipe the slate clean? But maybe if you could focus on part one, does he have reasonable... Let's just say for the moment he did not say you are free to leave. He still has him there. Does he have the requisite reasonable suspicion to warrant a further detention of the vehicle after the traffic stop? I believe that given the state of the law and what has been found to uphold reasonable suspicion, there were probably enough facts in this case to warrant a detention for a drug dog, provided that it complied with Place and Sharp. Are you familiar with the United States v. Williams, the Tenth Circuit case? I am, Your Honor. And I believe it was wrongly decided it should not be followed by this court. So the precedent in terms of the issue here is quite persuasive if you followed that. Well, there is enough precedent on this issue going against my position, certainly. In Williams, first of all, the detention itself consisted of, I believe, 15 minutes. It was a very short detention. I don't want to misspeak. About 80 minutes, correct? In our case? Yes. It was 80 minutes after he was told he was free to leave. Well, looking at Williams, did that nullify the constellation of factors? Let's look at those factors. You didn't know who Victor Bennett was on the insurance document, is that correct? Yes, that's correct. He resided in Brownsville, Texas, which borders, as you know, the Republic of Mexico and is a known hub of drug activity, correct? Correct, Your Honor. He was traveling toward, you'll forgive me, Philadelphia, which is also suspected to be a hub of drug activity. Although that can be said for just about any major restaurant in the West. Yet he knew the names of various streets in Philadelphia where he was allegedly visiting his cousin, is that correct? That's correct. He said he was going to Columbus, Ohio, which is the other way to get his uncle. Well, he also explained, and also there is evidence on the record that Mr. Leal is hard of hearing. Trooper Volk admitted that there were times when he was aware of Mr. Leal not perhaps hearing what he said. There may have been some communication problems we're not aware of. He lied to the officer with respect to crossing the border. Yes, he did, although Trooper Leal did not know that fact at the time he detained him. I'm sorry, Trooper Volk. He lied to the officer with respect to whether he had ever had any trouble with the law or had been fingerprinted, did he not? Yes, he did. He was arrested in the year 2000 for illegal expenditures and investing drug money, correct? Correct. So there were a lot of facts. And then we have the air freshener. All these factors, forgive me for saying this, the recitation went into the galaxy of articulable suspicion. You're correct, Your Honor. But if Trooper Volk had reasonable suspicion, there was no reason for him to tell Mr. Leal he was free to go unless he wanted Mr. Leal to consent. And if he consented, then the Trooper had a better scenario in which to fight any potential suppression motion. This court in United States v. Given or Givon, G-I-V-A-N, acknowledged that in upholding the denial of motion to suppress, it was important the fact that the Trooper told the gentleman he was free to go. In our case, we know Trooper Volk, when he said, you're free to go, never intended to let Mr. Leal go. I wanted to distinguish this from law enforcement's use of trickery for purposes of furthering investigation. This trickery is used for purposes of furthering litigation. It seems to me, and this is a total conjecture, but probably, I think it's a good guess, I've been around a lot of cases where the State Police have developed an unwritten procedure. And they know that if they stop someone and get consent, it's easier than if they don't get consent. So they will ask for consent, knowing full well the time they ask, they're going to search that car if they don't get it. And then sometimes they'll get the consent and everything's fine. Sometimes the person will say no, like your client, and then we get into an issue as to whether or not the consent figured into the officer's feelings about reasonable suspicion in a manner that's inconsistent with the Fourth Amendment. It reminds me of the case, and I can't think of the name of it, Justice Slobo, in the opinion, where police had developed a procedure where they would get a statement from a defendant while he or she was in custody, without Mirandizing the defendant, then give Miranda warnings, and after the Mirandized statement, get the defendant to basically adopt the pre-Miranda statement, and under the then existing state of the law, that was no problem, and the second statement after Miranda warnings were given was sufficient to purge the taint, and so the second statement came in, and with it came everything before Miranda was given. This looks like a species of that same procedure, but that doesn't mean there's anything wrong with it. If the officer had articulable suspicion, the first stop was okay. If the officer had articulable suspicion for Terry's stop, to investigate, it seems to me the only issue is whether or not in telling him, the officer, telling your client he's free to go, gives rise to a second stop. That's really your issue, and if there is a second stop, whether or not you need a second probable cause or articulable suspicion to justify it under the Fourth Amendment, and if, aside from that, the other issue is whether or not the length of the stop, even if it's a valid stop on your Terry, is so long, 90 minutes, that it's inconsistent with the parameters of Terry, and you're arguing both of those things, but frankly, it seems to me both arguments are equally weak. That's why I asked you my initial hypothetical, because had the officer not told your client he was free to go, it seems to me the officer could have, and I can't imagine him not telling your client, have a seat, I'm getting a dog out here. There's nothing to suggest that they held up getting the dog out there to jerk the client around or delay the stop. He got there as soon as he could. There's a traffic problem. There's a third scenario also, in which the officer tells, which you didn't mention, which an officer would tell someone he has maybe reasonable suspicion, decides he's going to let him go, but asked to engage in further facts to add to the reasonable suspicion analysis or come to light to the truth. In that case, in our case, the only significant event was Mr. Leal said, no, I won't consent, and I think you're racially profiling me. You're stopping me and you're asking me because I'm a Hispanic American. That's why I took that out of my hypothetical. He certainly can't consider the fact that the defendant said he talked to a lawyer, although that is strange. The officer can't, I don't think, consider that. He can't consider the defendant's refusal to give the consent as factoring into the articulable suspicion. And the fact that the defendant thought that he was being profiled, he can't figure. In fact, the officer apparently stopped him. He couldn't see if he was Hispanic or not. Not even know if he looks visually Hispanic, but it's clear that he was stopped because of the tinted windows and the officer couldn't see who was driving. That's why he was stopped. So all those things gone. We've got the air freshener. The window doesn't roll down. It almost seems as if Mr. Leal went to a course on how to give tips to the police. Drug trafficking for dummies, you may remember. On the other hand, this court has acknowledged that knowledge of drug interdiction programs is not sufficient, can't be considered. But the point is that, OK, if you said that there was reasonable suspicion to have a further detention beyond the initial detention, and the only thing that happens is he was told that he was free to leave. And this is probably the third case I've had like that. So it's clearly it's at least a Pennsylvania State Trooper protocol that they try to get consent. But is you are free to leave even relevant? Absolutely. May I answer? I'm sorry. Yes, I believe it is relevant. It's telling it signifies the troopers decision that that seizure has ended. The purpose for the initial stop has ended. They've terminated it. They've told him they're free to go. But in fact, as we know, they're not free to go. But it's true. But in the real world, what he's in effect doing, he's trying to see if he can get consent that fails. He then decides, OK, I'm going to take the next step to see if there's anything here. I want to call out the canine unit. Why doesn't he have suspicion? You've already conceded that he does have suspicion that perhaps that should have been done. And the only thing you can hang your head on is that you're free to leave. But how does that take away from all of the things that Judge Ackerman's noted that would give the trooper the belief that if I let this guy go, I'm going to get everything. The touchdown in the Fourth Amendment is reasonableness. It's not reasonable to have troopers telling persons they are free to go when in fact they are lying to the citizens and they have every intention of detaining them for however long it takes. Another 80 minutes, another 90 minutes. Everything except the trooper saying you're free to go. Everything. With the exception of the epic. When he learned, when the trooper learned that the vehicle had crossed into Mexico within a week or so before that, that was learned by Trooper Leal. After he had already told. Miss Brinson, is it fair to say that the district judge had a more nuanced reaction to what the devil was going on here with Officer Volk and Mr. Valdez? I'm not sure I understand what you're asking me, Your Honor. I'm not sure I understand exactly your question. Well, what I'm trying to get at, arguably, would you not agree that the district judge in his findings exhibited a more nuanced understanding of what was going on here when Leal was first asked for permission to search his vehicle? Perhaps. Your Honor, in any event, perhaps it should be heard on rebuttal with regard to the length of the detention. You say this maybe you can think about it and share your answer with us when you come back up. One thing jumped out at me, and Officer Volk did not mention it. It's not part of his recovering of our treatable suspicion. But I've never seen a case before where when the person is told can you step around to the rear of the car, he locks the car door and takes the keys with him. Had I been Trooper Volk, I would have immediately said, wait a minute. Why is this guy locking that door? Arguably, that's the kind of conduct that he can't factor into a probable cause analysis. But why is this guy locking his door? The only person there is the law enforcement officer. They're not leaving the car behind. He's told to step to the rear of the door and he locks the door. There were other things Trooper Volk relied upon, such as the fact that the vehicle was registered to a third party. He said he found that suspicious. The third party was Maria Leal of the same address. There was a lot of suspicion here, but that wasn't one of the things. But it was one of the things Trooper Volk cited as finding. He said, I found it strange. He was not working and it was a Monday. But if your reason for traveling is you're going to pick up someone or whatever, just because you're traveling on a Monday. He's also a carpenter. Yes, his hands were clean. There were many, many things that do not add up to reasonable suspicion. But there were some factors which I would agree under the current state of the law have been found by courts to satisfy reasonable suspicion. One thing you might want to think about when you get back on rebuttal in connection with the detention. The one police dog who could do a sniff test was 50 miles away. And there was construction on the turnpike getting there. So the police officer, the trooper appeared that he brought the dog as fast as he could. It took an hour and five minutes or so, not 10 minutes. But within five minutes after they got there, he had completed the sniff around the car. Isn't the real test. My question to you isn't the real test diligence and not necessarily the length of time. And I do have an answer to that. Would you like to hear it now? Thank you. May it please the court. My name is Rebecca Haywood. And I'm here on behalf of the United States. And I asked this court to affirm the conviction of Mr. Leal in this case because the Fourth Amendment was not violated in this case. When does the stop end? What if the defendant had gotten in his car when he was told he's free to go? Instead of driving down the highway and a ball call all of a sudden says, you know, I second thought, I'm not sure letting him go was such a good idea. Maybe I should have stopped him and had a dog come and check his car. So the trooper gets in his car, drives down the highway, puts on his red light, pulls him over and goes, you know, I told you you're free to go. But I was wrong about that. I want to let a dog check out your car. And maybe 10 minutes have passed in the meantime. Would that be a second stop? Absolutely it would. Certainly. What makes it a second stop? Allowing to leave the scene of the traffic stop. Would a separate set of articulable suspicion or reasonable cause be required for that second stop? Yes, it would. So when does he leave the scene? When he starts to turn around to get back in his car or when he pulls the car away? If it's the latter, how far down the road does he have to drive before you need a second set of factors to stop him? Certainly if he's in his car driving down the highway, that would be a second stop. What if he's in his car but he hasn't started driving yet? I believe the officer could still talk to him at that point. It would be a consensual encounter. Well, speaking to him is different than saying, stop, you're not going anywhere, I'm going to bring my dog or bring a dog. That's what I'm talking about. I'm not talking about another little chat with him. I'm saying the officer tells him, I changed my mind, you're not going anywhere, wait here until I get a dog. And the defendant has turned around, he's gotten in his car, he's started the ignition, but he hasn't pulled out yet. You're saying that's a second stop or the same stop? That's the same stop. How long is too long? Well, the courts in this case appear to, 90 minutes seems to be the outside. This case does not, is not a case making the law. This court has held in Frost an 80 minute detention as long as the officer... That's very, very different. If you're detained for 90 minutes for a luggage check, you've always got the option of leaving your suitcase behind and you'll get a property receipt and you can come back and get the suitcase. If there's nothing in there, you can come back and get it. If there is something in there, they'll come and get you, you don't have to worry about it. But certainly, the Supreme Court in place specifically addressed that issue and rejected the government's argument that there was a distinction between a seizure of luggage and a seizure of pursing. The Fourth Amendment, of course, is still a seizure, but in terms of the reasonableness and the diligence of the officer and the nature of the infringement on the individual's liberty to go as he or she pleases, there's a difference there. The court didn't say it wasn't. The court said, though, that if you detain someone's luggage at the airport, that person is attached to that luggage. In fact, in Frost, Mr. Frost was there with the officers. He attempted to get on a different flight and he had not been able to leave the scene. He is attached to that luggage and so there is a corresponding analogous seizure between the seizure of someone's luggage and the seizure of the person. In addition, in Frost, the court specifically noted that while the length of the detention is important, it is also important to note the officer's diligence in this case, as well as the government's important interest in preventing potential narcotics and getting distributed. So that is something that, in addition, is important, the government's interest in the detention. Let me back up with you on, just so I understand why we get so many cases that have the you are free to go in them. Why would not Cooper Volk have said, okay, here, I'll give you a citation or whatever for the tinted windows that violate Pennsylvania law. Would you mind, there's a lot of things that you've said that cause me to have suspicion. Would you be willing to give consent to a search of your vehicle? The answer in this case would have been no. Why does he have to say you are free to leave and then like Colombo say, oh, excuse me, I want to talk to you about something else here. What does he get out of that, other than give an issue to the other side? Well, at the state suppression hearing, there was some testimony that the Pennsylvania State Police officers believe that under Pennsylvania law, and I know that's different than Ohio v. Robinette in federal law, but under Pennsylvania law, that if they still have a driver's identification, that it was, to be honest, that they are trained to attempt to get consent. But attempting to get consent is not a bad thing. That saves the government numerous resources. If Mr. Leal had consented in this case, there would have been no need to call a drug doctor. You're explaining to me, I guess, why it is that they say you are free to leave. Right, certainly. That appeared to be the reason why you were seeing that type of thing from the Pennsylvania State Police. Ms. Haywood, some have said in situations like this, that a game is being played. Would you agree? Well, on this record, yes, as a government lawyer, I would think that they, but again, they're trying to get consent. They're trying to get a voluntary consent that would be upheld under although the testimony at the federal suppression hearing was that he was truly free to go. And the district court appeared to make a factual finding that that was the case. The consent here also, when he refused to consent, he just didn't say, no, I don't want to consent. Prior to the point he was asked to consent, he was very polite, there was no problem, but he got extremely agitated. He stated he went to consult a lawyer about consent searches when he is traveling to Columbus to pick up a sick uncle. That is just something that when you look at ordinary human experience, it's something that the trooper would have a reason to be suspicious of. But it may be, if this guy really believes that he's being singled out, not if he appears to be of Latino origin or not, but let's assume that he does appear visually to be Latino. He could, before he drove from Texas to Pennsylvania, think, you know, somewhere along the way, they're going to pull me over and stop me because of my appearance. I've got to find out whether or not I can say no. That's not that big of a stretch to me. Although with a tinted window, you never find his appearance. Well, right. But again, his reaction was unusual. And the Supreme Court has made clear that things that appear innocent also, when taken together, can obviously lead to reasonable suspicion. And that statement obviously heightened his questioning of this particular stop. In addition, I also want to mention, in Wren, the Supreme Court specifically found that an officer's subjective motivations as for the Fourth Amendment are not relevant. It's the objective reasonableness of all of the factors in this case that would have supported the decision to detain Mr. Leal for the period. You mentioned Atwater. It would have been okay to arrest him here under Pennsylvania law because of the tinted windows. You're not pursuing that. I assume it's because the arrest doesn't help you. You've got to show, and there was no evidence of inevitable discovery of what an inventory search would have looked like. So if he gets arrested for the tinted windows, that doesn't get them inside the door. That's right. How many, if you know, in the area of service that we're talking about here, how many dogs are in the area, the whole area, to serve for law enforcement purposes? It appeared that there was one dog in a six-county area. That's correct. Which counties are these? Somerset, Cambria. It's actually the eastern portion of Pittsburgh. Although there was testimony that he oftentimes perhaps went to Allegheny County, that there was sharing of the drug detection dogs throughout the whole western part of Pennsylvania. I was surprised. There was a case that came out of the western part of Pennsylvania years ago about whether or not a bloodhound alerting to a defendant's clothes constituted hearsay. The Pennsylvania Supreme Court had a big opinion on whether or not a bloodhound alerting is hearsay evidence. So I just thought that there were a lot more dogs in that area. Somebody had too much time on their hands. And again, the government doesn't dispute that 80 minutes is a significant length of time for the detention. But when you look at the government interest, you look at the officer's attempt to get there. It wasn't that the officer, Trooper Johnson, who had the drug dog, he put his lights on, he went to the scene, he didn't have another stop in between. He exerted diligence in attempting to get there. There was traffic construction. It wasn't even regular construction. It was traffic-paced construction where traffic is slowed. Well, if you're right, it seems to me the hard thing about writing an opinion here would be, at some point, after the defendant is free to leave and is thereafter detained, at some point you've got to have, as you conceded, a second probable cause or a particular suspicion to stop him. And it's kind of a bright line. Maybe we don't need to reach that issue, but if you were to prevail, how do you write an opinion that puts some kind of guidance out there so that police officers know at what point, when someone's free to go, they do not need a second set of probable cause or a particular suspicion to stop the person? In other words, they can tag along to the first set because that's all you've got here. I'm sorry, they can tag along to the... In other words, if you concede that you need a second probable cause, then don't you need a fresh set of information? Well, I did not believe I conceded that. At some point, if the gentleman is down the road, the stop has ended. But in this case, that's not... The stop did end because he was told he could leave, and then I assume once he's told he's free to go, the stop ended. Well, again, there are three cases, three different circuits have specifically held that an officer's telling an individual he's free to go is not really the end of a traffic stop. It doesn't nullify the objective, reasonable suspicion that has developed throughout the stop. And that is why the Supreme Court, I believe, in Wren, found that your subjective motivations of the officer are not relevant to this. But I think... The Fourth Amendment doesn't care about... As long as the conduct is reasonable and there is a traceable suspicion for the intrusion and the infringement on the Fourth Amendment interest, whether or not the officer decides in his or her own mind you're free to go, when they don't have to decide that, that just doesn't matter under the Fourth Amendment. And the officer said that he considered the man to be under arrest. Did he not? And again, that type of semantic in terms of what Trooper Bolt believed was an arrest, certainly Mr. Leal was not placed in handcuffs. He was put back in his car to wait. He was reading a paper, as I understand, in the car. That's correct. Talking on his cell phones. He was in his car. He was not Mirandized. He was not put in handcuffs. He was not put even in Trooper Bolt's vehicle. Do you think a reasonable person would assume they were free to leave? Trooper tells you, wait for a car, for a dog to arrive. I don't think he told him specifically to sit in the car and wait, but he said, wait for a dog to arrive. I certainly don't believe he would think he's free to go, but I certainly think it doesn't rise to a level of an arrest. Well, isn't that the test? If the officer has the subjective intent and communicates the intent, and the person is in a position where a reasonable person in that situation wouldn't feel that they were free to go, isn't that an arrest? Well, I certainly think there's a distinction between an investigatory detention and an arrest, and you certainly don't need probable cause for an investigatory detention. You need reasonable suspicion, which is what we have here. The government is not alleging probable cause, although some people might agree to argue that. I don't think you can argue probable cause in this circumstance. I'm glad you listened to this. I'm glad you listened to this. But what you have here is an investigatory detention, which Terry has been extended to allow these types of investigatory detentions on less than probable cause. So that is the distinction here. Okay, so there was an arrest. It was all Terry. Exactly. And again, I'm not disputing that you're getting to out of bounds. At some point, it is clear, at some point, the length of the detention itself is going to make a detention rise to arrest. But the case law has not found that 80 minutes is that point, especially where you have officers acting diligently. You also have Mr. Leal in his car, as Judge Ackerman noted, reading a newspaper. There was no communication that Mr. Leal needed to get any place that he was under any distress. You have to look at the circumstances, the totality of these circumstances, and Mr. Leal's sitting in his car not under any apparent distress. So under all of these circumstances, including the government's substantial interest, this was reasonable. This was okay under the Fourth Amendment. Thank you very much. Thank you. First of all, I would note the government states that we're reaching the outer limits with 80 minutes. If you're going to say that this talk was not terminated after the first 15-minute detention, you have to consider the entire time he was detained. He was detained for an hour and 35 minutes, an hour and 40 minutes before the drug dog alerted. From 1.30 p.m. in the afternoon when Trooper Garg pulled him over until 3.05 p.m., which is set forth in the updated probable cause in the appendix, Mr. Leal sat on the side of the road under Terry. But my argument would be, let's assume there were not all of these tells with respect to the two phones, the information from Texas going across the Brownsville-Mexican border 21 times, et cetera. But wouldn't a stop just for a violation of the tinted window provision of Pennsylvania law be enough to stop someone for 15 minutes? Yes, I believe it would. So then doesn't the clock start again? If the clock starts again, there should be some additional reasonable suspicion or reason to detain him. But what happened in the course of his discussions with Mr. Leal, he didn't have insurance, saw all of these other things, and I counted up at one point 11 of them. And again, if you're following the manual for the trooper, he really has little choice in terms of what he has to answer to his superiors, but to continue the investigation further to see if there is anything. And then I think it would seem to be, according to the cases, it comes down to how diligent they were. And it appears in this case there is a good argument that they weren't quite diligent in trying to get the canine there. I would ask the court to go back and look very carefully at United States v. Sharp in which the United States Supreme Court was considering whether a 20-minute detention of a person was reasonable or not reasonable under the circumstances. And in that case, the Supreme Court said that the detention is too long in duration to be considered an investigative stop. It's appropriate to consider whether police pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. That's on page 686 of the opinion. Nothing in Sharp eliminated... It seems to me you're in a situation where everything he knows, if you're right, let's assume that he also knows that Johnson is out in the indolence somewhere with his dog, and even though he doesn't know about the traffic, he knows it's going to take Johnson a good, I think that was his name, it's going to take him a good hour to get there with the dog. So he figures, well, I'm going to detain this guy for an hour, I'm going to let him go. Then he's in a position where he has to try to tell his superiors, I just stopped this guy, he's driving back and forth from Mexico all the time, prior conviction for his air freshener in the car, two cell phones, and the supervisor goes, great, great, where is he? And the boy goes, all right, let him go. May I continue, Your Honor? What else could he have done? The testimony establishes in the appendix that this was the only canine unit for a very large six-county area. One dog for this Pennsylvania State Police. The Pennsylvania State Police had a policy, it's on page 365 to 67 in the appendix, where they were required to use a Pennsylvania State Police canine unit. And he testified, Trooper Johnson, it was not uncommon for him to travel an hour or more to get to a stop. Compare those to the facts in Bloomfield, a case on which the United States relies, an Eighth Circuit case. The airport case is very, very different. Isn't it as Bloomfield Airport case? I apologize, Your Honor, I don't know. But I do know that the officer, I don't believe it was, because he requested a dog as soon as possible, said if one was not available, he would get to send him one from any state highway patrol. And in that case, only one hour had stopped, had passed by the time, between the time of the initial stop and the time of the arrest. Ms. Brunson, before you leave the desk, can we reason together? I'm sure you would agree that the finding that the district court made as to the time that was taken was clearly erroneous. Clearly. Yes, and the government concedes that. But by the same token, under the circumstances, in weighing the totality of the circumstances, did the court violate your client's Fourth Amendment rights under the circumstances? Did the court? Did the court make its finding? It's possible, Your Honor, because the time is not, my argument is, and I want this court to consider that the Fourth Amendment under Terry has an independent requirement that the length of the detention not be too long. There is a point in which the detention alone, the Supreme Court recognized that point as 90 minutes in place. In Sharp, it said, in considering whether it's too long, you can take into consideration the diligence. Nowhere in Sharp did the Supreme Court say that diligence is now the overriding concern. We determine whether the length. But here, in terms of detention, it was what, at most 75 minutes after excluding the, if you add in your 15 minutes, you're still within 90, right, by the time the police officer showed? Only if you start the clock at the point when he's told he's free to leave. Even if you start where you wanted, it's still 85. There's nothing hard about it. 90, as the government concedes, is close to the outer limits. I believe this court can make the determination of whether the length alone exceeds the bounds of Terry. And Justice Marshall in Sharp, I would ask you to look at his concurrence. He wrote separately to make sure that it was understood that there's still a test independent of diligence in the brevity of the stop. And he said Terry stops are permissible because they're just that. They're stops. They're not prolonged detentions. And you have to take into consideration the degree of intrusion on the individual's liberty. And the degree of intrusion of a 90-minute stop, an 80-minute stop, 95 minutes, we're way beyond the realm of Terry. Well, you're making a good argument. The intrusion is just so many of the Fourth Amendment says you can't do this. No matter how much good faith they have, no matter how promptly they respond, you come to a point where the intrusion is such that the Fourth Amendment doesn't allow their diligence to be an excuse. And that's what you're arguing we have here. Exactly, Your Honor, because we don't have probable cause. And the Fourth Amendment only allows these stops that are based on less than probable cause. It's a narrow exception to the probable cause requirement of the Fourth Amendment. The Fourth Amendment gives us the right to insist on searches and seizures that are supported by probable cause. We don't have that here. There is a narrow exception for brief stops under Terry. And these stops, in this case, no court, the United States Supreme Court and no federal court of appeals that I'm aware of has approved a 95-minute detention of a person under Terry. One final question. Is the trooper Volk's belief that there was an arrest, that he had actually arrested Mr. Leal, you're not arguing today that that makes any difference? Is that because of the Supreme Court decision Stuart came out that says you look at objective, a reasonable person standard rather than the subjective belief of the officer? That's part of it, yes. His subjective belief, I think it's relevant to the whole. I hope that this case gives the court pause because it shows that the trooper is engaging in this game with motorists and telling them they're free to go. He's not free to go. He's admitted he subjectively no way was going to let this guy go. He considered him under arrest from the point he told him to, probably before he even told him he was free to go. He said as he's sitting in his truck or his state patrol vehicle, he's writing up the affidavit of probable cause including the drug alert. The dog hasn't even arrived at the scene yet. This is a very troubling case, I believe. Trooper Volk's testimony as to his subjective beliefs in combination with the several stories he gave as to how he first saw the vehicle, it undermines his credibility. The fact that he kept Mr. Leal on the side of the road in February, a thousand miles from home for an hour and a half on the side of the road, it's simply not reasonable. And it wouldn't be reasonable if it happened to anyone else. We have to look at this case as though there were no drugs. Would it be reasonable, even with all these flags of suspicion? There was a case in Karns versus Gretzky. I would keep him and get a dog there within a reasonable amount of time such that it would come within the Terry exception to the probable cause requirement, or let him go. Thank you. You're being referred, I guess, to Karns. I think that's in your brief. It is, Your Honor. Thank you very much. Thank you very much, Your Honor. Very interesting case. We thank counsel for a very helpful argument.